UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

UNITED STATES OF AMERICA

v.                                                          Case No. 2:21-cr-16-TPB-NPM

ROBERT WILLIAM SANCHEZ

_____

**REPORT AND RECOMMENDATION**

Before the court are defendant Robert Sanchez's motion to dismiss (Doc. 33) and motion to suppress (Doc. 32). Sanchez allegedly used a minor to produce visual depictions of sexually explicit conduct, and he is therefore charged in a one-count indictment with producing child pornography in violation of 18 U.S.C. § 2251(a). (Doc. 1). Because the federal government apparently seeks to hold him criminally liable without any showing that the images crossed state lines, Sanchez argues the case brought against him constitutes an improper exercise of the federal government's power to regulate interstate commerce. And based on the contention that he was the victim of an unreasonable search and seizure, Sanchez argues that all evidence obtained pursuant to two search warrants should be suppressed. Sanchez's arguments lack merit, and so his motions should be denied.

## I.    FACTUAL BACKGROUND

As set forth in Charlotte County Sheriff Detective Paul Underwood's affidavit for a search warrant, Underwood began an investigation on November 9, 2020, into allegations that Sanchez committed a sexual battery on a girl when he was over eighteen and she was under twelve years old, which pursuant to section 794.011(2)(a) of Florida's statutes is a capital felony. (Doc. 37, pp. 2-3).[1] The then-twelve-year-old victim alleged Sanchez—about 22 years her senior—sexually abused her in both Florida and Ohio from when she was about five or six years old until she was twelve. *Id*., pp. 3-4.

Over the course of several years, Sanchez would, among other things, blindfold or handcuff the victim and penetrate her mouth with his penis. *Id*. Such episodes of physical abuse would last for "hours." *Id*., p. 4. He would also take photographs or videos of her while she was nude or wearing lingerie. *Id*., p. 3. When recounting this abuse, the victim referred to Sanchez using at least four cellphones to take pictures of her, and further explained that he used two iPhones, two Androids, and a digital camera. *Id*., pp. 3-4. When describing the incriminating evidence that could be found at Sanchez's residence in Port Charlotte, Florida, the victim and her

---

[1] Detective Underwood's December 11, 2020 affidavit for a search warrant, and the search warrant issued by Judge Geoffrey Gentile of Florida's Twentieth Circuit Court for Charlotte County later the same day, are filed as a consolidated and sealed exhibit to the government's response to the pending motions.

mother referred to the possible presence of multiple cellphones, a digital camera, and digital memory cards. *Id*., p. 6.

Finding probable cause to believe that evidence of the alleged crime of sexual battery would be found in Sanchez's residence, Florida Circuit Court Judge Geoffrey Gentile issued a search warrant authorizing a search of the residence and the seizure of "digital electronics and media devices including (but not limited to): computers, cellular phones/tablets, digital storage devices, digital camera(s) and/or digital video recorder(s), etc." (Doc. 37, pp. 7-8). And the warrant further authorized a forensic examination of such property for "evidence of sexual abuse including (but not limited to): images depicting sexual performance of a child." *Id*., p. 8.

Upon execution of the search warrant at the residence on December 11, 2020, law enforcement officers seized several cell phones and a Nikon digital camera. (Doc. 32, p. 3; Doc. 34, p. 4). A subsequent forensic examination of the digital camera's memory card revealed numerous photographs and videos depicting child pornography apparently created as early as May 12, 2018. (Doc. 32, pp. 3-4; Doc. 34, p. 4). The government contends the digital camera's memory card was manufactured outside the state of Florida (Doc. 34, p. 5), and for purposes of the pending motions, the defense does not contest this fact. Further, the government concedes the images and videos were produced in Florida, and for purposes of the pending motions, it does not contend the images were ever transmitted or transported

out of state. *Id.*, p. 5. More specifically, the images include depictions of Sanchez sexually abusing the victim in his Port Charlotte residence. *Id.*, p. 4. And in some of these files, Sanchez's face is shown. *Id*.

Based on this evidence, another search warrant was issued on December 23, 2020, compelling Sanchez to be photographed both clothed and unclothed. When executing the second warrant, officers found a distinguishing feature on Sanchez that matched a feature captured in a video depicting sexual abuse of the victim. The government apparently intends to use the products of both search warrants at trial. (Doc. 32, p. 4; Doc. 34, p. 4). Sanchez argues the two searches resulting from the warrants rise or fall together based on whether the first search was proper. The government does not argue otherwise.

## II.     THE CONSTITUTIONALITY OF 18 U.S.C. § 2251(a)

"The use of children as subjects of pornographic materials is harmful to the physiological, emotional, and mental health of the child" and the prevention of it "constitutes a government objective of surpassing importance." *United States v. Ruggiero*, 791 F.3d 1281, 1288 (2015) (quoting *New York v. Ferber*, 458 U.S. 747, 757-58, (1982)) (cleaned up). As Congress found when enacting the Child Pornography Prevention Act of 1996, Pub. L. No. 104-208, § 121, 110 Stat. 3009 (1996):

> (1) the use of children in the production of sexually explicit material, including photographs, films, videos, computer images, and other visual

depictions, is a form of sexual abuse which can result in physical or psychological harm, or both, to the children involved;

(2) where children are used in its production, child pornography permanently records the victim's abuse, and its continued existence causes the child victims of sexual abuse continuing harm by haunting those children in future years;

(3) child pornography is often used as part of a method of seducing other children into sexual activity; a child who is reluctant to engage in sexual activity with an adult, or to pose for sexually explicit photographs, can sometimes be convinced by viewing depictions of other children "having fun" participating in such activity;

(4) child pornography is often used by pedophiles and child sexual abusers to stimulate and whet their own sexual appetites, and as a model for sexual acting out with children; such use of child pornography can desensitize the viewer to the pathology of sexual abuse or exploitation of children, so that it can become acceptable to and even preferred by the viewer;

\*     \*     \*

(10)(A) the existence of and traffic in child pornographic images creates the potential for many types of harm in the community and presents a clear and present danger to all children; and

(B) it inflames the desires of child molesters, pedophiles, and child pornographers who prey on children, thereby increasing the creation and distribution of child pornography and the sexual abuse and exploitation of actual children who are victimized as a result of the existence and use of these materials;

(11)(A) the sexualization and eroticization of minors through any form of child pornographic images has a deleterious effect on all children by encouraging a societal perception of children as sexual objects and leading to further sexual abuse and exploitation of them; and

(B) this sexualization of minors creates an unwholesome environment which affects the psychological, mental and emotional development of children and undermines the efforts of parents and families to encourage the sound mental, moral and emotional development of children;

(12) prohibiting the possession and viewing of child pornography will encourage the possessors of such material to rid themselves of or destroy the material, thereby helping to protect the victims of child pornography and to eliminate the market for the sexual exploitative use of children; and

(13) the elimination of child pornography and the protection of children from sexual exploitation provide a compelling governmental interest for prohibiting the production, distribution, possession, sale, or viewing of visual depictions of children engaging in sexually explicit conduct ….

110 Stat. at 3009–26, –27.

And as Congress also found when enacting the Adam Walsh Child Protection and Safety Act of 2006, Pub. L. No. 109-248, § 501(1)(D)-(F), 120 Stat. 587 (2006):

> (D) Intrastate incidents of production, transportation, distribution, receipt, advertising, and possession of child pornography … have a substantial and direct effect upon interstate commerce because:
>
> (i) Some persons engaged in the production, transportation, distribution, receipt, advertising, and possession of child pornography conduct such activities entirely within the boundaries of one state. These persons are unlikely to be content with the amount of child pornography they produce, transport, distribute, receive, advertise, or possess. These persons are therefore likely to enter the interstate market in child pornography in search of additional child pornography, thereby stimulating demand in the interstate market in child pornography.
>
> (ii) When the persons described in subparagraph (D)(i) enter the interstate market in search of additional child pornography, they are likely to distribute the child pornography they already produce, transport, distribute, receive, advertise, or possess to persons who will distribute additional child pornography to them, thereby stimulating supply in the interstate market in child pornography.
>
> (iii) Much of the child pornography that supplies the interstate market in child pornography is produced entirely within the boundaries of one state, is not traceable, and enters the interstate market surreptitiously. This child pornography supports demand in the interstate market in child pornography and is essential to its existence.
>
> (E) Prohibiting the intrastate production, transportation, distribution, receipt, advertising, and possession of child pornography … will cause some persons engaged in such intrastate activities to cease all such activities, thereby reducing both supply and demand in the interstate market for child pornography.
>
> (F) Federal control of the intrastate incidents of the production, transportation, distribution, receipt, advertising, and possession of child pornography … is essential to the effective control of the interstate market in child pornography.

120 Stat. at 623-624.

Thus, the statute under which Sanchez is charged, which makes it a federal crime to produce child pornography "using materials that have been mailed, shipped, or transported in or affecting interstate or foreign commerce by any means," 18 U.S.C. § 2251(a), is part of a comprehensive regulatory scheme intended to completely shut down the nationwide supply of, and demand for, child pornography. *United States v. Parton*, 749 F.3d 1329, 1330 (11th Cir. 2014).

The source and extent of federal authority to regulate a market in this way is found in and defined by two clauses of the Constitution of the United States; namely, the Commerce Clause and the Necessary and Proper Clause. The Commerce Clause states: "Congress shall have power to … regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3. And the Necessary and Proper Clause declares: "Congress shall have power to … make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." U.S. Const. art. I, § 8, cl. 18. Arguing that the regulation of child pornography that never leaves a state is beyond the scope of these enumerated powers, Sanchez contends the federal prohibition against the production of child pornography is unconstitutional, both as applied to him and on its face. (Doc. 33, p. 3).

"A facial challenge, as distinguished from an as-applied challenge, seeks to

invalidate a statute or regulation itself." *United States v. Ruggiero*, 791 F.3d 1281, 1285 (11th Cir. 2015) (quoting *United States v. Frandsen*, 212 F.3d 1231, 1235 (11th Cir. 2000)). "It is 'the most difficult challenge to mount successfully' because it requires a defendant to show 'that no set of circumstances exists under which the [law] would be valid.'" *Id.* (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). Thus, if section 2251(a) as applied to Sanchez is constitutional, his facial challenge to the statute fails. *United States v. Guite*, 652 F. App'x 829, 833 (2016).

Acknowledging that binding Eleventh Circuit precedent currently forecloses his constitutional challenge,[2] Sanchez "nonetheless maintains that § 2251(a) is unconstitutional in light of" *United States v. Lopez*, 514 U.S. 549 (1995). (Doc. 33, p. 3). But the statute held unconstitutional in *Lopez*—the Gun–Free School Zones Act of 1990,[3] which made it a federal offense to knowingly possess a firearm in a school zone—was neither "an essential part of a larger regulation" of the nationwide gun trade, nor a prohibition against gun possession with a statutory link to interstate commerce as an element of the offense. *Lopez*, 514 U.S. at 551, 561.

The federal prohibition against the production of child pornography differs from the Gun–Free School Zones Act on both counts. It is part of a comprehensive

---

[2] Indeed, the federal circuit courts have been unified in their rejection of Commerce Clause challenges to section 2251(a). *See United States v. Ruggiero*, 791 F.3d 1281, 1290 n.9 (11th Cir. 2015) (collecting cases).

[3] Pub. L. No. 101-647, 104 Stat. 4844 (1990).

scheme to eliminate child pornography from the national marketplace, and criminal liability may be imposed only if the government satisfies an express link to interstate commerce set forth in the statute. The first of these two distinctions, standing alone, provides a sufficient ground for holding that 18 U.S.C. § 2251(a), as applied to Sanchez, is a proper exercise of the federal government's power to regulate interstate commerce. That is, independent from how the government might satisfy the interstate-commerce element of the offense, there is no Commerce Clause impediment to his prosecution.

It has long been established that when the federal government adopts a comprehensive regime to regulate the interstate market for a certain product, the regulatory regime can extend to purely intrastate activity—even activity that does not involve any transfer or exchange of the product—if the failure to regulate that class of activity would undermine the regulatory regime. Some eighty years ago in *Wickard v. Filburn*, 317 U.S. 111 (1942), the Supreme Court held that because the federal government had adopted a comprehensive regime to sustain and stabilize a minimum national price for wheat, it could regulate the amount of wheat cultivated by an individual farmer—even if the cultivation was only for personal consumption. *Id*. at 128-129. As the Court reasoned in *Wickard*, it was reasonable to conclude that the practice of personal cultivation, taken in the aggregate, would depress demand (or potentially inflate supply if the wheat were diverted from personal use), and so

it was proper to regulate personal cultivation in order to sustain and stabilize the price at which the commodity would trade in interstate commerce. *Id*. at 127-129.

And the Supreme Court has squarely rejected a post-*Lopez* challenge to this doctrine. In *Gonzales v. Raich*, 545 U.S. 1 (2005), individuals who cultivated marijuana in their homes for personal use argued that the prohibition against the possession and use of marijuana contained in the federal Controlled Substances Act[4] should not be applied to them. *Id*. at 7. But to control all traffic in controlled substances, the Controlled Substances Act erected a comprehensive "regulatory system making it unlawful to manufacture, distribute, dispense, or possess any controlled substance except in a manner authorized by the [Act]." *Id*. at 12-13 (citing 21 U.S.C. §§ 841(a)(1), 844(a)). So, it was within the federal government's limited and enumerated powers to regulate even a state-approved practice of personally cultivating marijuana for medical purposes. *Id*. at 22.

As the Court reasoned in *Raich*, the Controlled Substances Act is meant to control supply and demand and eliminate certain "commercial transactions in the interstate market in their entirety." *Id*. at 19. Therefore, "Congress had a rational basis for believing that failure to regulate the intrastate manufacture and possession of marijuana would leave a gaping hole in the [Act]." *Id*. at 22. Just like the legislation upheld in *Wickard*, the enactment of the Controlled Substances Act was

---

[4] Pub. L. No. 91-513, §§ 100-709, 84 Stat. 1236, 1242-1284 (1970).

well within the federal government's authority to "make all Laws which shall be necessary and proper" to "regulate Commerce ... among the several States." *Id*. (quoting U.S. Const. art. I, § 8); *see also id*. at 38 (Scalia, J., concurring) ("As *Lopez* itself states, and the Court affirms today, Congress may regulate noneconomic intrastate activities only where the failure to do so 'could ... undercut' its regulation of interstate commerce." (quoting *Lopez*, 514 U.S. at 561)).

"The power to regulate interstate commerce 'extends not only to those regulations which aid, foster and protect the commerce, but embraces those which prohibit it.'" *Id*. at 39-40 (Scalia, J. concurring) (quoting *United States v. Darby*, 312 U.S. 100, 113). Thus, the Commerce Clause "unquestionably permits" federal efforts to extinguish an interstate market for a category of goods. *Id*. at 39. Whether the Constitution allows such efforts to reach purely intrastate activity "depends only upon whether they are appropriate means of achieving the legitimate end of eradicating [the illicit product] from interstate commerce." *Id*. at 40.

Prohibiting the purely intrastate production of child pornography is an appropriate means of eradicating a vile and destructive product from interstate commerce. *See United States v. Smith*, 459 F.3d 1276, 1282 (11th Cir. 2006). Therefore, the Eleventh Circuit has repeatedly rejected post-*Lopez*, Commerce Clause challenges to the federal imposition of criminal liability for producing illicit images; even when the images neither crossed state lines nor traded hands from one

individual to another. *See*, *e.g.*, *United States v. Ruggiero*, 791 F.3d 1281, 1290 (11th Cir. 2015) (affirming conviction even though the child pornography was not produced for any commercial purpose); *United States v. Dykes*, 227 F. App'x 834, 834 (11th Cir. 2007) (affirming conviction even though the child pornography was produced in Alabama and remained there); *Smith*, 459 F.3d at 1282 (affirming conviction even though the government "did not attempt to demonstrate that the images either traveled in interstate commerce themselves or were produced with the intent that they would travel in interstate commerce").

In short, "there is nothing irrational about Congress's conclusion, supported by its findings, that pornography begets pornography, regardless of its origin. Nor is it irrational for Congress to conclude that its inability to regulate the intrastate incidence of child pornography would undermine its broader regulatory scheme designed to eliminate the market in its entirety ...." *United States v. Maxwell*, 446 F.3d 1210, 1218 (11th Cir. 2006).[5]

---

[5] While in a sense the federal regulatory regime theoretically leaves a segment of the child pornography market unregulated (because its express scope reaches only images that cross state lines or were meant to, or images made with materials that crossed state lines), this point of distinction from regimes expressly defined as all-encompassing—like the one created by the Controlled Substances Act—does not warrant a different analysis. "Congress could rationally conclude that it need only address most, but not all, intrastate child pornography (and thereby intrude on traditional state authority to a lesser extent) ...." *United States v. Maxwell*, 446 F.3d 1210, 1218 n.8 (11th Cir. 2006). And in a practical sense, there is no distinction at all. "The intrastate possession of child pornography produced using purely intrastate materials is a class of activity that simply does not exist in modern society." *Id.*

Even if the illicit images allegedly created by Sanchez were never exchanged with anyone and were never transmitted or transported across state lines, federal regulation of his conduct is a necessary and proper means of achieving a constitutionally legitimate end. In sum, *Lopez* does not support, *Raich* contradicts, and *Smith* precludes Sanchez's constitutional challenges to the government's prosecution for his alleged violation of 18 U.S.C. § 2251(a).[6]

## III.   THE PROPRIETY OF THE FIRST SEARCH WARRANT

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. And a warrant may not issue except "upon

---

[6] The second point of distinction from the statute at issue in *Lopez*—that is, 18 U.S.C. § 2251(a)'s inclusion of an express interstate-commerce requirement as an element of the offense—would fail, standing alone, to withstand Sanchez's constitutional challenge. Here, the government intends to satisfy the interstate-commerce element of the statute by showing that the images were created by using materials that crossed state lines. This is somewhat like the showing often used to justify federal prosecutions of felons in possession of a gun; that the gun itself had crossed state lines sometime before it came into the hands of the felon. And the Eleventh Circuit has repeatedly rejected post-*Lopez*, Commerce Clause challenges to the minimum nexus used to justify such prosecutions. *See United States v. Williams*, 855 F. App'x 635, 636-637 (11th Cir. 2021); *but see Alderman v. United States*, 131 S. Ct. 700, 702-703 (2011) (Justices Thomas and Scalia dissenting from the denial of certiorari and reasoning that this minimum nexus approach needs post-*Lopez* review by the Court). But the connection here is even more tenuous than that which is often tendered in a felon-in-possession case, because at least in those cases the object of the regulation traveled across state lines, while here, only the materials used to create the object did. Tellingly, when rejecting post-*Raich*, Commerce Clause challenges to federal child pornography convictions, the Eleventh Circuit has never relied on the interstate-commerce element in the statute and has instead reasoned that the federal government may prohibit the intrastate conduct in order to enforce a comprehensive regulatory regime. *See, e.g., United States v. Guite*, 652 F. App'x 829, 833 (11th Cir. 2016); *United States v. Parton*, 749 F.3d 1329, 1330 (2014); *United States v. Culver*, 598 F.3d 740, 747 (2010).

probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV. Based on Detective Underwood's affidavit, the warrant at issue here authorized a search of Sanchez's residence for evidence related to the crime of sexual battery on a child under twelve by an adult over eighteen, and in particular the seizure of "digital electronics and media devices including (but not limited to): computers, cellular phones/tablets, digital storage devices, digital camera(s) and/or digital video recorder(s);" and a forensic search of such items for "evidence of sexual abuse including (but not limited to): images depicting sexual performance of a child." (Doc. 37, pp. 7-8).

Sanchez argues the evidence gathered against him should be suppressed because the residential search warrant was improper. While largely based on a misreading of the affidavit in support of the search warrant application, Sanchez's arguments advance a three-pronged attack: first, the information supplied to Detective Underwood was outdated and so there was insufficient evidence to find probable cause that incriminating evidence would be found in Sanchez's residence and on his devices when the warrant was executed; second, there was insufficient evidence to find probable cause to authorize the seizure and forensic search of digital devices other than cell phones; and third, the authorization to forensically search items listed in the warrant was so limitless that it impermissibly granted law

enforcement a general warrant. (Doc. 32). Because the questions presented by Sanchez's motions do not turn on the resolution of any disputed facts, and instead involve only questions of law—such as whether the search warrant lacked probable cause or was overly broad—the issues may be resolved based on the written submissions of the parties, and there is no need to conduct an evidentiary hearing. *United States v. Horne*, 198 F. App'x 865, 870 (11th Cir. 2006).

### A.  Whether Probable Cause Existed When the Warrant Was Issued

"Probable cause to support a search warrant exists when the totality of the circumstances allow[s] a conclusion that there is a fair probability of finding contraband or evidence at a particular location." *United States v. Carroll*, 886 F.3d 1347, 1351 (11th Cir. 2018) (quoting *United States v. Brundidge*, 170 F.3d 1350, 1352 (11th Cir. 1999)). But "the information supporting the government's application for a warrant must show that probable cause exists at the time the warrant issues." *United States v. Touset*, 890 F.3d 1227, 1237-1238 (11th Cir. 2018) (quoting *United States v. Bervaldi*, 226 F.3d 1256, 1264 (11th Cir. 2000)).

"There is no particular rule or time limit for when information becomes stale." *Bervaldi*, 226 F.3d at 1265. So, whether the information has gone stale and no longer supplies probable cause requires a case-by-case analysis of several factors, such as "the length of time …, the nature of the suspected crime (discrete crimes or ongoing conspiracy), habits of the accused, character of the items sought, and nature and

function of the premises to be searched." *Touset*, 890 F.3d at 1238 (cleaned up); *see also United States v. Goldstein*, 989 F.3d 1178, 1193 (11th Cir. 2021) (noting that "evaluating staleness requires a fact-intensive inquiry based on the totality of the circumstances").

In the context of child pornography, the federal circuit courts of appeal have repeatedly rejected staleness challenges to search warrants. As the Eleventh Circuit reasoned in *Touset*:

> [Other circuits] have observed that "pedophiles rarely, if ever, dispose of child pornography." *United States v. Zimmerman*, 277 F.3d 426, 434 (3d Cir. 2002); *see also United States v. Burkhart*, 602 F.3d 1202, 1206-07 (10th Cir. 2010); *United States v. Morales-Aldahondo*, 524 F.3d 115, 119 (1st Cir. 2008); *United States v. Hay*, 231 F.3d 630, 636 (9th Cir. 2000). And probable cause of involvement in electronic child pornography remains even longer because deleted files can remain on electronic devices. *See United States v. Frechette*, 583 F.3d 374, 379 (6th Cir. 2009); *Hay*, 231 F.3d at 636. As the Tenth Circuit explained, "information that a person received electronic images of child pornography is less likely than information about drugs, for example, to go stale because the electronic images are not subject to spoilage or consumption." *Burkhart*, 602 F.3d at 1207. And other circuits have ruled that probable cause remained after passages of time similar to the interval here [one and a half years]. *See, e.g.*, *Frechette*, 583 F.3d at 378-79 (16 months); *Morales-Aldahondo*, 524 F.3d at 119 (three years).

890 F.3d at 1238.

Here, the victim claimed Sanchez continually abused her from when she was around five or six until she was twelve years old. And she was twelve when she made the allegations against Sanchez. Further, the victim and her mother alleged that Sanchez retained video and photographic recordings of the abuse (Doc. 37, pp. 3-6), and that he maintained a collection of other sexually explicit images and used them

to groom the victim (*id.*, pp. 4-5), all of which weighs against any finding of staleness. *See United States v. Lovvorn*, 524 F. App'x 485, 487 (11th Cir. 2013) ("Files on a computer are less likely than other types of contraband to disappear over time and can often be recovered even if they are deleted."). Thus, the information provided to Detective Underwood by the victim and her mother was not stale, and it supplied a sufficient basis to find probable cause.

### B.   Whether Probable Cause Existed to Seize and Search the Camera

The scope of a lawful search is "defined by the object of the search and the places in which there is probable cause to believe that it may be found." *Maryland v. Garrison*, 480 U.S. 79, 84 (1987) (quoting *United States v. Ross*, 456 U.S. 798, 824 (1982)). And "probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983).

Implicitly conceding that Underwood's affidavit supplied probable cause to seize and subsequently search the cell phones found in his house, Sanchez argues this showing should circumscribe the search for digital evidence (to cell phones only) and not supply probable cause to seize and search digital devices generally, such as the memory card in the digital camera. (Doc. 32, p. 7). But to get there, Sanchez misreads the affidavit. He contends that the "only reference to digital cameras in the affidavit was the contention that at an unspecified time and under

unspecified circumstances, Mr. Sanchez had used one." *Id*. And he further contends "the affidavit stopped short of indicating that a digital camera was used to record the abuse." *Id*. This is a myopic and unfair reading of the affidavit.

Affidavits for search warrants must be interpreted "in a commonsense and realistic fashion." *United States v. Ventresca*, 380 U.S. 102, 108 (1965). Detective Underwood's affidavit refers to the digital camera **twice**. Both references tie it to Sanchez's alleged abuse of the victim. The first reference is contained in a paragraph discussing the victim's account of the sexually explicit photographs and videos taken and retained by Sanchez. Some of the photographs were of the victim, and Sanchez gave her money after taking them. Other photographs and videos depicted two of the victim's female relatives engaged in sexually explicit acts. And the victim explained that Sanchez "used both cellphones, two Androids and two iPhones, and an actual digital camera too." (Doc. 37, p. 4).

The second reference is found in a paragraph in which the victim's mother clarifies, during a phone call with Underwood, the types of potentially incriminating evidence that could be found in Sanchez's residence. She explained that Sanchez might keep lingerie—tied with rubber bands to fit the victim—in a work bag, and a digital file on his work laptop named "girls and boys for [the victim]." And when discussing hidden compartments in the residence, she "indicated the possible presence of multiple cellphones, digital camera, and digital memory cards." *Id*., p. 6.

18

Thus, this aspect of Sanchez's argument is without basis in fact.

Even if the witnesses had made no reference whatsoever to a digital camera, it still would have remained proper under the circumstances for the warrant to authorize a seizure of all digital and media devices and a forensic search of them for evidence of the sexual abuse. Probable cause exists when "'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Jenkins*, 901 F.2d 1075, 1080 (11th Cir. 1990) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). "[T]he nexus between the objects to be seized and the premises searched can be established from the particular circumstances involved and need not rest on direct observation." *Id*. (quoting *United States v. Lockett*, 674 F.2d 843, 846 (11th Cir.1982)). The affidavit generally recounted that Sanchez retained photographs and videos of a years-long pattern of sexually abusing the victim, that he had used photographs and videos to entice the victim to participate in sex acts with him, and that he maintained related files on a laptop. These facts would warrant a person of reasonable caution to believe that a search of Sanchez's digital and media devices would uncover evidence of the abuse.

## C.   Whether the Authorized Search Amounted to a General Warrant

A "general" or "blanket" warrant may authorize a virtually limitless search for items indicating that someone may be engaged in some undefined form of criminal activity, or it may authorize an ill-defined search for items related to a

potential crime without reasonable limits in time or place. *United States v. George*, 975 F.2d 72, 76 (2d Cir. 1992) ("Mere reference to 'evidence' of ... general criminal activity provides no readily ascertainable guidelines for the executing officers as to what items to seize …. [A]uthorization to search for 'evidence of a crime,' that is to say, any crime, is so broad as to constitute a general warrant."). And general warrants are expressly prohibited by the Fourth Amendment's particularity requirement. U.S. CONST. amend. IV (requiring warrants to "particularly describ[e] the place to be searched, and the persons or things to be seized"); *see also United States v. Haimowitz*, 706 F.2d 1549, 1558 (11th Cir. 1983) (warrants that allow "'a general, exploratory rummaging in a person's belongings,' are prohibited" (quoting *Andresen v. Maryland*, 427 U.S. 463, 480 (1976))).

The test of whether a warrant satisfies the particularity requirement is one of reasonableness. "Elaborate specificity is unnecessary." *United States v. Carroll*, 886 F.3d 1347, 1351 (11th Cir. 2018) (quoting *United States v. Strauss*, 678 F.2d 886, 892 (11th Cir. 1982)). Thus, a warrant is sufficiently particular "if it is as specific as the circumstances and nature of the activity under investigation permit," and "'it enables the searcher reasonably to ascertain and identify the things to be seized.'" *United States v. Rousseau*, 628 F. App'x 1022, 1025 (11th Cir. 2015) (quoting *United States v. Santarelli*, 778 F.2d 609, 614 (11th Cir. 1985)).

Sanchez argues the residential search warrant constituted a general warrant

because it granted law enforcement "unbridled discretion" to determine which items would be subject to a forensic examination. (Doc. 32, pp. 8-9). Not so. As a threshold matter, the warrant authorized the seizure of items from a specific residence and a search of them for evidence of a specific crime, and the search needed to be completed within ten days. (Doc. 37, pp. 7-8). This alone can be sufficient to distinguish the warrant here from that of a general warrant. *See United States v. Rousseau*, 628 F. App'x 1022, 1025-1026 (11th Cir. 2015) ("[W]here it is not feasible at the time the warrant is issued to give an exact description of the materials to be seized, the warrant satisfies the Fourth Amendment's particularity requirement if it limits the seizure of items to only those items that constitute evidence of criminal activity.").

Further, the warrant expressly incorporated Detective Underwood's affidavit, listed certain items (like handcuffs and lingerie) and certain categories of items (like digital electronics and media devices), found probable cause to believe that the described items would contain evidence connected to the commission of the stated crime (sexual battery of a pre-pubescent minor by an adult), and commanded law enforcement to seize and search "the above named property." (Doc. 37, pp. 7-8). As such, the warrant was as specific as the circumstances and nature of activity under investigation would permit; it enabled law enforcement to reasonably ascertain and identify the items for which a forensic examination was authorized; and it came

21

nowhere close to authorizing an unfettered rummaging through Sanchez's personal effects.

### D.    Whether the Good Faith Exception Precludes any Suppression

Even if the residential search warrant somehow fell short of the Fourth Amendment's requirements, suppression of the evidence gathered from Sanchez's home (or the follow-up evidence gathered from his person) would not be warranted because the search would fall within the "good-faith exception" to the exclusionary rule established by *United States v. Leon*, 468 U.S. 897, 104 (1984).

In *Leon* the Supreme Court held that "evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant" should generally not be excluded. 468 U.S. at 922. The Court noted two circumstances that could justify exclusion in a case like this one: (1) if the warrant was based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable" or (2) if the warrant was "so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers c[ould not have] reasonably presume[d] it to be valid." *Id*. at 923. And when determining whether officers reasonably relied on a search warrant, the focus is "on a reasonably well-trained officer and is based upon the totality of the circumstances." *United States v. Martin*, 297 F.3d 1308, 1318 (11th Cir. 2002) (quotation and citation omitted).

The residential search warrant does not fall within either category of excludable warrants. It incorporated a detailed affidavit authored by a well-credentialed detective that was, in turn, based on the personal observations of the victim and interviews with her mother (who was also personally familiar with the defendant). Considering the facts supplied in the affidavit and the reasons stated above regarding the probable cause for, and the particularity of, the warrant, a reasonably well-trained officer would have been justified in relying on the warrant. Thus, the *Leon* good faith exclusion is triggered, and suppression of the evidence found during the search is not appropriate.

## IV.   CONCLUSION AND RECOMMENDATION

The federal prohibition against the production of child pornography is not unconstitutional, either facially or as applied to Sanchez. The residential search warrant did not violate the Fourth Amendment because, among other things, it was supported by probable cause and satisfied the particularity requirement. Even if the search warrant somehow fell short of the Fourth Amendment's requirements, suppression of the evidence gathered as a result would not be appropriate because a reasonably well-trained officer would have been justified in relying on the warrant.

Accordingly, both Sanchez's motion to dismiss (Doc. 33) and his motion to suppress (Doc. 32) should be **DENIED**.

Respectfully recommended on March 22, 2021.

*Nicholas P. Mizell*

NICHOLAS P. MIZELL
UNITED STATES MAGISTRATE JUDGE

## NOTICE TO PARTIES

A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions. A party's failure to file written objections "waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions." *See* 11th Cir. R. 3-1. **To expedite resolution, parties may file a joint notice waiving the 14-day objection period.**